**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:18-cv-23786-MARTINEZ-OTAZO-REYES**

| |
|---|
| CHARLES STEINBERG, Individually and on Behalf of All Others Similarly Situated, |
| Plaintiff, |
| v. |
| OPKO HEALTH, INC., PHILLIP FROST, ADAM LOGAL, and JUAN RODRIGUEZ, |
| Defendants. |

**LEAD PLAINTIFF'S UNOPPOSED MOTION FOR PRELIMINARY APPROVAL
OF SETTLEMENT AND AUTHORIZATION TO DISSEMINATE NOTICE
OF SETTLEMENT, AND INCORPORATED MEMORANDUM OF LAW**

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES. ..................................................................................... iii

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     NATURE OF THE ACTION AND PROCEDURAL HISTORY...................... 3

III.    THE PROPOSED SETTLEMENT ............................................................ 4

IV.     THE PROPOSED SETTLEMENT MERITS PRELIMINARY
        APPROVAL ........................................................................................ 5

        A.      Standards Governing Approval of Class Action Settlements ................ 5

        B.      The Court "Will Likely Be Able to" Approve the Proposed
                Settlement Under Rule 23(e)(2) ..................................................... 6

                1.      "Procedural" Aspects of the Settlement Satisfy Rule
                        23(e)(2) ........................................................................... 6

                2.      The Settlement's Terms Are Adequate and Equitable.............. 8

V.      THE PROPOSED SETTLEMENT CLASS SATISFIES RULE 23 ............... 12

        A.      The Settlement Class Satisfies the Requirements of Rule 23(a)........... 13

                1.      The Settlement Class is So Numerous that Joinder Is
                        Impracticable.................................................................... 13

                2.      There Are Common Questions of Law and Fact ..................... 14

                3.      Lead Plaintiff's Claims Are Typical of Those of the
                        Settlement Class................................................................ 14

                4.      Lead Plaintiff Will Fairly and Adequately Protect the
                        Interests of the Settlement Class.......................................... 15

        B.      The Settlement Class Satisfies the Requirements of Rule 23(b)(3)..... 16

                1.      Common Legal and Factual Questions Predominate................ 16

                2.      A Class Action Is Superior to Other Methods of
                        Adjudication..................................................................... 17

VI.     THE COURT SHOULD APPROVE THE PROPOSED FORM OF
        NOTICE AND PLAN FOR PROVIDING NOTICE TO THE
        SETTLEMENT CLASS ........................................................................ 18

VII.    PROPOSED SCHEDULE OF SETTLEMENT EVENTS ............................ 19

VIII.   CONCLUSION...................................................................................................... 19

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*AAL High Yield Bond Fund v. Ruttenberg*,
     229 F.R.D. 676 (N.D. Ala. 2005) ........................................................................................14

*Amchem Prods. v. Windsor*,
     521 U.S. 591 (1997) ...........................................................................................13, 16, 17

*In re Amerifirst Sec. Litig.*,
     139 F.R.D. 423 (S.D. Fla. 1991) .......................................................................................15

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
     568 U.S. 455 (2013) ..........................................................................................................15

*Aranaz v. Catalyst Pharm. Partners Inc.*,
     2014 WL 11870214 (S.D. Fla. Dec. 3, 2014) ....................................................................18

*In re BellSouth Corp. Sec. Litig.*,
     2006 WL 870362 (N.D. Ga. April 3, 2006) .......................................................................17

*Bennett v. Behring Corp.*,
     737 F.2d 982 (11th Cir. 1984) .............................................................................................6

*In re Blech Sec. Litig.*,
     187 F.R.D. 97 (S.D.N.Y. 1999) .........................................................................................17

*Borcea v. Carnival Corp.*,
     238 F.R.D. 664 (S.D. Fla. 2006) ...................................................................................7, 13

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed
     Care, L.L.C.*, 504 F.3d 229 (2d Cir. 2007) ......................................................................14

*In re Checking Account Overdraft Litig.*,
     2011 WL 5873389 (S.D. Fla. Nov. 22, 2011) .....................................................................7

*In re Checking Account Overdraft Litig.*,
     275 F.R.D 654 (S.D. Fla. 2011) ........................................................................................13

*In re Chicken Antitrust Litig. Am. Poultry*,
     669 F.2d 228 (5th Cir. 1982) ...............................................................................................5

*D'Amato v. Deutsche Bank*,
     236 F.3d 78 (2d Cir. 2001) ..................................................................................................7

*In re Drexel Burnham Lambert Grp., Inc.*,
     960 F.2d 285 (2d Cir. 1992) ..............................................................................................15

*Faught v. Am. Home Shield Corp.*,
   661 F.3d 1040 (11th Cir. 2011) ................................................................6

*Fresco v. Auto Data Direct, Inc.*,
   2007 WL 2330895 (S.D. Fla. May 14, 2007) ..........................................5

*Hefler v. Wells Fargo & Co.*,
   2018 WL 4207245 (N.D. Cal. 2018) .......................................................12

*Hicks v. Client Servs., Inc.*,
   2008 WL 5479111 (S.D. Fla. Dec. 11, 2008) .........................................14

*Holman v. Student Loan Xpress, Inc.*,
   2009 WL 4015573 (M.D. Fla. Nov. 19, 2009) ..........................................7

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
   2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) .........................................17

*In re Miller Indus. Sec. Litig.*,
   186 F.R.D. 680 (N.D. Ga. 1999)..............................................................13

*N.Y. State Teachers' Ret. Sys. v. Gen. Motors Co.*,
   315 F.R.D. 226 (E.D. Mich. 2016) ..........................................................12

*In re OCA, Inc. Sec. & Deriv. Litig.*,
   2008 WL 4681369 (E.D. La. Oct. 17, 2008) .............................................5

*In re Painewebber Ltd. P'ships Litig.*,
   171 F.R.D. 104 (S.D.N.Y. 1997) ..............................................................7

*Perez v. Asurion Corp.*,
   501 F. Supp. 2d 1360 (S.D. Fla. 2007) .....................................................7

*In re Polaroid ERISA Litig.*,
   240 F.R.D. 65 (S.D.N.Y. 2006) ..............................................................16

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015).....................................................................16

*Shapiro v. JPMorgan Chase & Co.*,
   2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ........................................15

*In re Theragenics Corp. Sec. Litig.*,
   205 F.R.D. 687 (N.D. Ga. 2002)..............................................................16

*In re U.S. Oil & Gas Litig.*,
   967 F.2d 489 (11th Cir. 1992) ..................................................................5

*In re Veeco Instruments Inc. Sec. Litig.*,
   2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ..........................................................8

*In re Veeco Instruments, Inc. Sec. Litig.*,
   235 F.R.D. 220 (S.D.N.Y. 2006) .............................................................15, 16, 17

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) .....................................................................................18

*Warren v. City of Tampa*,
   693 F. Supp. 1051 (M.D. Fla. 1988) ........................................................................7

*Williams v. Bluestem Brands, Inc.*,
   2019 WL 1450090 (M.D. Fla. Apr. 2, 2019) ...........................................................5

**STATUTES AND RULES**

Private Securities Litigation Reform Act of 1995,
   15 U.S.C. § 78u-4(a)(7) ...........................................................................................18

Class Action Fairness Act of 2005,
   28 U.S.C. § 1715 *et seq.* .........................................................................................18

Fed. R. Civ. P. 23 ........................................................................................... *passim*

Court-appointed Lead Plaintiff, The Amitim Funds, on behalf of itself and the other members of the Settlement Class, respectfully submits this unopposed motion, pursuant to Rule 23(e)(1) of the Federal Rules of Civil Procedure, for entry of the Parties' agreed-upon [Proposed] Order Preliminarily Approving Settlement and Authorizing Dissemination of Notice of Settlement (the "Preliminary Approval Order"), which is attached hereto as Exhibit 2.[1]

## I.   PRELIMINARY STATEMENT

Lead Plaintiff has reached a proposed Settlement with OPKO Health, Inc. ("OPKO" or the "Company") and its former Chief Executive Officer, Dr. Phillip Frost (collectively, "Defendants") that will resolve all claims in this Action in exchange for a cash payment of $16,500,000 for the benefit of the Settlement Class. Lead Plaintiff now seeks the Court's preliminary approval of the Settlement under Rule 23(e)(1) so that notice of the Settlement can be disseminated to the Settlement Class and a hearing to consider final approval of the Settlement can be scheduled.

In agreeing to settle the Action, Lead Plaintiff and Lead Counsel made an informed evaluation of the risks of continued litigation. Lead Plaintiff respectfully submits that the Settlement appropriately balances Lead Plaintiff's objective of securing the greatest possible monetary recovery for the Settlement Class against the significant risk that the Settlement Class could receive a smaller recovery—or no recovery at all—had litigation continued. While Lead Plaintiff believes its claims had merit, it faced substantial risks that it might not succeed on the pending motion to dismiss, on an expected motion for summary judgment, at trial, and on appeal. Moreover, even if Lead Plaintiff were successful at each stage of litigation, any such recovery would likely not be obtained for at least several years.

This delay would have created substantial additional risks to Lead Plaintiff's ability to recover an amount greater than the $16.5 million Settlement. As a result of OPKO's strained financial situation and issues concerning the available insurance, which was disputed, there were risks that continued litigation might lead to circumstances in which Lead Plaintiff would be unable to recover any substantial monetary judgment. OPKO itself had limited cash available to contribute to any settlement and Lead Plaintiff had reasonable concerns that the Company's financial condition could worsen during the course of further litigation such that it might not be able to fund

---

[1] All capitalized terms used herein that are not otherwise defined shall have the meanings provided in the Stipulation and Agreement of Settlement dated June 26, 2020 (the "Stipulation"), which is attached hereto as Exhibit 1.

an amount larger than the Settlement Amount. Moreover, OPKO's insurance was a wasting asset that would have continued to have been further reduced or depleted if litigation continued, and was the subject of an insurance coverage dispute that could potentially have left no insurance available for Lead Plaintiff's claims. Under these circumstances, Lead Plaintiff strongly believes that the current $16.5 million settlement is a favorable result for members of the Settlement Class.

The proposed Settlement here is the result of lengthy arm's-length negotiations conducted with the assistance of an experienced and highly respected mediator, Jed D. Melnick, Esq. of JAMS. These negotiations included the exchange of detailed mediation statements and participation in a full-day mediation session, which did not yield an agreement. Following the mediation session, the parties engaged in months of additional discussions and negotiations facilitated by Mr. Melnick. This process ultimately culminated in Mr. Melnick issuing a mediator's recommendation that the Action be settled for $16.5 million, which the Parties accepted.

By the time the agreement to settle was reached, Lead Plaintiff and Lead Counsel had conducted an extensive investigation into the claims asserted, including the review and analysis of a detailed SEC complaint based on a regulatory investigation; had researched and filed a detailed consolidated complaint; had fully briefed Defendants' motion to dismiss the complaint; and had conducted the mediation session with Defendants, as well as lengthy follow-up discussions—all of which informed their determination that the Settlement is fair, reasonable, and adequate to the Settlement Class. In addition, Lead Counsel's continued monitoring of OPKO's financial condition also informed Lead Plaintiff's decision concerning the Settlement and its timing. As a result of these efforts, Lead Plaintiff was knowledgeable about the strengths and risks of the case when the Settlement was reached, despite the relatively early stage of the litigation.

Lead Plaintiff now requests that this Court enter the proposed Preliminary Approval Order which will, among other things: (i) preliminarily approve the Settlement based on findings that the Court (a) will likely be able to finally approve the Settlement and (b) will likely be able to certify the Settlement Class for purposes of the Settlement; (ii) approve the form and manner of providing notice of the Settlement to the Settlement Class; and (iii) schedule a hearing at which the Court will consider final approval of the Settlement, the proposed Plan of Allocation, and Lead Counsel's motion for an award of attorneys' fees and Litigation Expenses (the "Settlement Hearing").

At the Settlement Hearing, following additional briefing and addressing any potential objections to the Settlement, Lead Plaintiff and Lead Counsel will ask the Court to make a final

determination as to whether, in accordance with Rule 23(e)(2), the Settlement is fair, reasonable, and adequate, and, if the Court approves the Settlement, to enter the Parties' proposed Judgment, which will dismiss the Action with prejudice.[2]

For the reasons set forth herein, Lead Plaintiff respectfully requests that the Court enter the proposed Preliminary Approval Order so that notice may be sent to the Settlement Class and a final approval hearing can be scheduled.

## II.    NATURE OF THE ACTION AND PROCEDURAL HISTORY

OPKO is a diversified healthcare company that, among other things, has multiple investments in developing companies. In addition to developing its own products, OPKO acquires or takes significant stakes in smaller healthcare companies that are purportedly focused on developing new products. Throughout the Class Period (from September 26, 2013 through September 7, 2018, inclusive), OPKO and Dr. Frost, its Chairman, CEO, and largest shareholder, touted OPKO's "strategic investments" in "early-stage companies" that would purportedly generate growth and therefore value for OPKO shareholders.

On September 7, 2018, the United States Securities & Exchange Commission (the "SEC") filed a complaint alleging that OPKO and Dr. Frost, among others, had violated United States securities laws by manipulating the stock prices of several developing healthcare companies, including two companies in which OPKO had invested: BioZone Pharmaceuticals, Inc. ("BioZone") and MabVax Therapeutics ("MabVax"). The SEC complaint alleged that several associates of Defendants engaged in orchestrated trading and the release of false promotional pieces to artificially increase the share price of BioZone and MabVax, and then sold the shares to unsuspecting investors. The price of OPKO common stock fell sharply after the SEC complaint was made public at approximately 1:57 p.m. New York time on September 7, 2018. Trading of

---

[2] Together with this Motion, Lead Plaintiff has filed a Notice of Dismissal as requested by the Court's May 29, 2020 Order. The Notice of Dismissal provides that the Action shall be dismissed with prejudice upon the entry of the Judgment by the Court after the Settlement Hearing. Lead Plaintiff does not believe that the Action should be dismissed before the Settlement Hearing. *See* Rule 23(e)(2) (settlement or voluntary dismissal of class claims should occur "only after a hearing").

OPKO common stock on U.S. exchanges was halted at about 2:34 p.m. on September 7, 2018, and when trading in the U.S. resumed on September 14, 2018, the price declined still further.[3]

The action was commenced on September 14, 2018. On April 10, 2019, the Court appointed The Amitim Funds to serve as Lead Plaintiff for the Action, and approved Lead Plaintiff's selection of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") as Lead Counsel. On May 3, 2019, Lead Plaintiff filed and served its Consolidated Class Action Complaint asserting claims against Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Dr. Frost under Section 20(a) of the Exchange Act, and against Defendants for violation of the Israel Securities Law, 1968, for purchases made on the TASE. The claims were premised on Defendants' allegedly materially false and misleading statements relating to OPKO's investments in early stage companies.

On June 17, 2019, Defendants filed their motion to dismiss the Complaint. On July 19, 2019, Lead Plaintiff filed its papers in opposition to the motion and, on August 19, 2019, Defendants filed their reply papers. Lead Plaintiff moved for leave to file a sur-reply on August 27, 2019, Defendants filed their opposition on August 29, 2019, and Lead Plaintiff filed its reply papers on September 5, 2019. The Court granted Lead Plaintiff's Motion for Leave to File a Sur-Reply on February 14, 2020, and Lead Plaintiff filed its sur-reply on February 21, 2020.

## III.    THE PROPOSED SETTLEMENT

On December 17, 2019, the Parties attended an all-day mediation with Jed D. Melnick of JAMS. During the mediation session, the Parties engaged in vigorous settlement negotiations with the assistance of the Mr. Melnick. No agreement was reached at the mediation. After months of additional discussion and negotiation facilitated by Mr. Melnick, Mr. Melnick issued a mediator's recommendation that the Action be settled for $16.5 million, subject to certain terms and conditions and the execution of a customary "long form" stipulation and agreement of settlement and related papers, which the Parties accepted on May 28, 2020.

On May 29, 2020, the Parties informed the Court via a telephonic conference that they had reached a settlement in principle, and, on that same day, the Court issued its Order on Notice of

---

[3] OPKO common stock also traded on the Tel Aviv Stock Exchange ("TASE"). Friday September 7, 2018 was not a trading day on the TASE. The next day that OPKO traded on the TASE following the September 7, 2018 disclosure of the SEC complaint was September 13, 2018. The price of OPKO common stock on the TASE dropped on that date.

Settlement denying all pending motions as moot and administratively closing the case. On June 26, 2020, the Parties executed the Stipulation setting forth the final terms of the settlement.

## IV.     THE PROPOSED SETTLEMENT MERITS PRELIMINARY APPROVAL

### A.     Standards Governing Approval of Class Action Settlements

Rule 23(e) of the Federal Rules of Civil Procedure provides that the Court should approve a class action settlement if the Court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In conducting this analysis, courts have long recognized a strong policy and presumption in favor of class action settlements. *See In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits."); *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982) ("[O]ur judgment is informed by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement[.]").

Judicial approval of a class action settlement is a two-step process. First, in the stage currently before the Court on this Motion, the Court performs a preliminary review of the terms of the proposed settlement to determine whether to send notice of the proposed settlement to the class. *See* Fed. R. Civ. P. 23(e)(1). Second, after notice has been provided and a hearing has been held, the Court determines whether to actually approve the settlement. *See* Fed. R. Civ. P. 23(e)(2).

A court should grant preliminary approval to authorize sending notice of a proposed settlement to the class upon a finding that it "will likely be able" to finally approve the settlement under Rule 23(e)(2) and certify the proposed Settlement Class. *See* Fed. R. Civ. P. 23(e)(1)(B); *Williams v. Bluestem Brands, Inc.*, 2019 WL 1450090, at *1 (M.D. Fla. Apr. 2, 2019).

This standard for preliminary approval of class action settlements was newly established by amendments to Rule 23(e) that became effective on December 1, 2018. Prior to those amendments, courts had developed a standard for preliminary approval through case law that was substantively similar to the current standard but phrased differently. A common formulation was that the court should grant preliminary approval to a proposed settlement, "if it is within the range of possible approval or, in other words, [if] there is probable cause to notify the class of the proposed settlement." *See Fresco v. Auto Data Direct, Inc.*, 2007 WL 2330895, at *4 (S.D. Fla. May 14, 2007); *see also In re OCA, Inc. Sec. & Deriv. Litig.*, 2008 WL 4681369, at *11 (E.D. La. Oct. 17, 2008) ("As this motion is for *preliminary* approval of a class action settlement, the standards are not as stringent as those applied to a motion for final approval.").

5

In considering *final* approval of the Settlement, Rule 23(e)(2) provides that the Court should consider whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorneys' fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).[4]

The proposed Settlement satisfies these factors, and preliminary approval is appropriate.

**B.      The Court "Will Likely Be Able to" Approve the Proposed Settlement Under Rule 23(e)(2)**

**1.      "Procedural" Aspects of the Settlement Satisfy Rule 23(e)(2)**

Rule 23(e)(2)(A) requires that the Court to consider whether the class representative and counsel have adequately represented the class, and Rule 23(e)(2)(B) requires the Court to consider whether the settlement is the result of arm's-length negotiations. Together, these factors constitute the "procedural" aspect to the settlement fairness inquiry.[5]

The proposed Settlement has the hallmarks of a procedurally fair resolution under Rule 23(e)(2). First, as discussed further below in Part V.A.4, Lead Plaintiff is an adequate representative of the Settlement Class because it has claims that are typical of other Settlement Class Members, has no interests antagonistic to other Settlement Class Members, and has an interest in obtaining the largest possible recovery from Defendants.

---

[4] At final approval, the Court will also consider the Eleventh Circuit's traditional factors set forth in *Bennett v. Behring Corp.,* 737 F.2d 982 (11th Cir. 1984): "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of the proceedings at which the settlement was achieved." *Bennett,* 737 F.2d at 986; *see also Faught v. Am. Home Shield Corp.*, 661 F.3d 1040, 1047 (11th Cir. 2011). These factors largely overlap with the factors set forth in Rule 23(e)(2). The fifth *Bennett* factor, which concerns the reaction of the class, cannot yet be ascertained because notice of the Settlement has not yet been sent to class members.

[5] *See* Fed. R. Civ. P. 23(e)(2), Advisory Committee Note to 2018 Amendment (these two factors "look[] to the conduct of the litigation and of the negotiations leading up to the proposed settlement").

Moreover, the Settlement was reached only after extensive arm's-length negotiations between the Parties, that were conducted with the assistance of an experienced mediator. The mediation process included the exchange of detailed mediation statements, and a full-day mediation session under the auspices of Jed D. Melnick of JAMS, one of the country's preeminent mediators of securities class actions. After no agreement was reached at the mediation, the Parties engaged in further months of discussions with the mediator. The proposed Settlement is the result of a mediator's recommendation. These facts strongly support the conclusion that the Settlement is fair. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("[M]ediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure."); *Holman v. Student Loan Xpress, Inc.*, 2009 WL 4015573, at *5 (M.D. Fla. Nov. 19, 2009) (no fraud or collusion on reaching settlement because the settlement was the product of arm's-length negotiations before a mediator); *Borcea v. Carnival Corp.*, 238 F.R.D. 664, 675 (S.D. Fla. 2006) (settlement reached after mediation was "the product of good-faith, arm's length negotiations rather than collusion or overreaching by the parties.").

In addition, Lead Plaintiff and Lead Counsel were knowledgeable about the strengths and weaknesses of the case prior to reaching the agreement to settle. Lead Counsel conducted an extensive investigation regarding the alleged fraud; prepared and filed a detailed consolidated complaint; briefed defendants' motion to dismiss; and engaged directly with Defendants' arguments at the mediation.

Accordingly, the Court should give considerable weight to Lead Plaintiff and Lead Counsel's judgment that the Settlement is in the best interests of the Settlement Class. Indeed, "[i]n evaluating a proposed class action settlement, the Court will not substitute its business judgment for that of the parties." *In re Checking Account Overdraft Litig.*, 2011 WL 5873389, at *6 (S.D. Fla. Nov. 22, 2011). Lead Counsel's substantial experience in cases of this nature gives further weight to its judgment that the Settlement is fair and reasonable.[6] Finally, the fact that Lead Plaintiff is a sophisticated institutional investor, of the type favored by Congress when it passed

---

[6] *See, e.g., Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1384 (S.D. Fla. 2007) ("[a] district court properly considers the judgment of experienced counsel when asked to approve a class action settlement."). *See also Warren v. City of Tampa*, 693 F. Supp. 1051, 1055 (M.D. Fla. 1988); *In re Painewebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997) ("'Great weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation.").

the PSLRA, strengthens the force of its recommendation that the Settlement be approved. *See In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) ("a settlement reached . . . under the supervision and with the endorsement of a sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness….'").

In sum, these factors demonstrate the procedural fairness of the proposed Settlement.

### 2.    The Settlement's Terms Are Adequate and Equitable

Rules 23(e)(2)(C) and 23(e)(2)(D) direct the Court to evaluate whether "the relief provided for the class is adequate" and "the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(C)-(D). Here, the Settlement represents a favorable result for the Settlement Class.  Further, Lead Counsel, with the assistance of Lead Plaintiff's damages expert, has proposed a Plan of Allocation that treats Settlement Class Members equitably.

### a)    The Settlement Provides Substantial Relief, Especially in Light of the Costs, Risks, and Delay of Further Litigation

The Settlement's $16.5 million cash recovery is a substantial benefit to the Settlement Class Members, especially in light of the significant risks posed by continued litigation. Lead Plaintiff and Lead Counsel believe that their claims have merit.  However, Lead Plaintiff and Lead Counsel recognize that continued litigation of the Action through the pending motion to dismiss, a motion for class certification, a motion for summary judgment, trial, and appeal presented a number of substantial risks, as well as significant expense and years of delay. Lead Plaintiff faced challenges in proving that Defendants made materially false or misleading statements or material omissions, that Defendants made the misstatements or omissions with fraudulent intent or were reckless in making them, and in proving loss causation and damages.

Defendants would contend that the SEC complaint that gave rise to this Action identified a different individual as the primary strategist who orchestrated the alleged stock manipulation schemes, and contained only sparse allegations about OPKO and Dr. Frost's involvement. Defendants would further contend that the SEC complaint's allegations about OPKO and Dr. Frost's involvement were wrong and that the actual facts would not support Lead Plaintiff's fraud claims, but would show that Defendants were unaware of any alleged stock manipulation. Defendants could point to the fact that OPKO did not sell any of the stock of the two companies at issue, Dr. Frost sold only small portions of his holdings of one of the two companies, and both Defendants continued to invest heavily in the companies after the purported stock manipulation. Defendants would argue that these facts made it implausible that Defendants were involved in the

scheme and undercut any inference they acted with scienter. Moreover, OPKO and Dr. Frost resolved the SEC complaint by settling lesser claims that did not include an element of scienter (as required for the fraud claims alleged in this Action). Defendants would also contend that it made absolutely no sense for a person like Dr. Frost—a wealthy and successful businessman—to be knowingly involved in penny stock fraud. Thus, Lead Plaintiff faced the risk that it might not be able to prove that Defendants were aware of or participated in the stock manipulation scheme that underpinned this case.

In addition, Defendants would argue that many of the challenged statements were puffery or otherwise not actionable. Defendants also would contend that the claims for a substantial portion of the Class Period were barred by the statute of repose.

As to any clams that remained, Defendants would argue that Lead Plaintiff could not establish loss causation as a result of any alleged misstatements because the underlying facts about OPKO's and Dr. Frost's investments in BioZone and MabVax were already known to the market through an analyst report issued before the Class Period. Moreover, Defendants would have argued that the SEC complaint was unproven and the allegations were contested, and thus, it could not act as a true corrective disclosure of the alleged misstatements.

Lead Plaintiff also recognizes the significant risks and uncertainty involved in pursuing its claims through the various stages of litigation, including overcoming Defendants' motion to dismiss, obtaining a litigated class certification order, defending against a summary judgment motion, and then succeeding at trial and on subsequent appeals—a process that could possibly extend for years.

Moreover, Lead Plaintiff also faced substantial risks of recovering on any judgment it obtained based on OPKO's ability to pay, a factor which was an important driver of Lead Plaintiff's determination that the amount of the Settlement and its timing were in the best interest of the Settlement Class. OPKO's insurance was limited and was a wasting asset that would have continued to have been reduced if litigation continued. Moreover, there was a publicly disclosed coverage dispute between Defendants and their insurers that—if litigated and decided adversely to OPKO—could have left none of the insurance available to the class in this Action. Further, OPKO itself had only limited cash available to contribute to any settlement or other recovery. In the months leading up to the Settlement, OPKO's financial condition was questionable and Lead Plaintiff had reasonable concerns that, if OPKO's financial condition continued to deteriorate

during the course of protracted litigation, the Company might not be able to fund an amount equal to or larger than the Settlement Amount. If the concerns about OPKO's ability to pay and the available insurance materialized, the class might have been unable to recover any amount even comparable to the Settlement through litigation (even assuming, as was by no means certain, that Lead Plaintiff prevailed on the merits of its claims at each procedural stage).[7]

Finally, the Settlement is reasonable when considered in relation to the range of potential recoveries that might be obtained if Lead Plaintiff prevailed, which was far from certain for the reasons noted above. While the maximum potential damages that might theoretically be sought at trial were substantially higher that the Settlement obtained, as a practical matter, the limits on OPKO's insurance and financial capabilities created a realistic ceiling for any recovery here that was considerably lower.

In sum, Lead Plaintiff respectfully submits that, considering the risks of continued litigation, Defendants' ability to pay, and the time and expense which would be incurred to prosecute the action through a trial, the $16.5 million Settlement represents a favorable recovery that is in the best interests of the Settlement Class.

### b)     The Settlement Treats All Settlement Class Members Fairly

The Settlement does not improperly grant preferential treatment to Lead Plaintiff or any segment of the Settlement Class. All Settlement Class Members will be eligible to receive a distribution from the Net Settlement Fund pursuant to an equitable plan of allocation to be approved by the Court.

At the Settlement Hearing, Lead Plaintiff will ask the Court to approve the proposed Plan of Allocation, which is set forth in full in the Notice. Lead Plaintiff's damages expert, in consultation with Lead Counsel, developed the proposed Plan. The Plan divides the Net Settlement Fund into a fund for payment of claims of Settlement Class Members who purchased OPKO common stock on U.S. exchanges, including the New York Stock Exchange and Nasdaq (the "US

---

[7] While Dr. Frost has his own substantial financial resources, the claims asserted against him would have been particularly difficult to prove because he continued to invest in OPKO common stock during the Class Period. Defendants' Counsel would have argued that these continued purchases were inconsistent with the allegation that Dr. Frost intended to mislead investors in order to artificially inflate the price of OPKO common stock. Thus, proceeding with the litigation in order to assert claims against Dr. Frost, without regard to OPKO's diminishing ability to pay, would have been highly risky and could potentially have resulted in no meaningful recovery for the class.

Net Settlement Fund"), and one for the payment of claims of Settlement Class Members who purchased OPKO common stock on the TASE (the "TASE Net Settlement Fund").[8]

In order to share in the US Net Settlement Fund, Settlement Class Members will need to submit a Claim Form documenting their transactions in OPKO common stock during the Class Period.  As set forth in the Plan, a US Recognized Claim will be calculated for each such claimant based on the amount and timing of their purchases and any sales of OPKO common stock traded on U.S. exchanges. Once the Claims Administrator has processed all submitted claims, the Claims Administrator will make *pro rata* distributions of the US Net Settlement Fund to eligible claimants through checks and wire transfers.

Settlement Class Members who purchased shares traded on the TASE will not have to submit a Claim Form to be eligible for a recovery on those shares.  Instead, the Claims Administrator will take advantage of a "claim free" mechanism that is available for Israeli shareholder class actions. Under this procedure, TASE member brokers will report the total number of eligible shares purchased by their clients, and the Claims Administrator will send each broker its *pro rata* share of the TASE Net Settlement Fund, which the brokers will then distribute to their clients.

With respect to both the US Net Settlement Fund and TASE Net Settlement Fund, persons who bought OPKO common stock during the Class Period but sold it before the SEC complaint was released on September 7, 2018 will not be entitled to any recovery for such purchases.

c)      **The Settlement Does Not Excessively Compensate Plaintiffs' Counsel**

The proposed Settlement does not grant excessive compensation to Plaintiff's Counsel. The Settlement does not contemplate any specific award to Plaintiffs' Counsel. Counsel will be compensated solely out of the Settlement Fund in an amount to be approved by the Court.

When the motion for final approval of the Settlement is filed, Lead Counsel will also file a motion for attorneys' fees and payment of Litigation Expenses in which Lead Counsel will seek fees of 20% of the Settlement Fund for all Plaintiffs' Counsel.[9] This amount is well within the

---

[8] The allocation of the Net Settlement Fund between these two funds was determined by the relative trading volume of shares on the U.S. exchanges and the TASE during the Class Period, as determined by Lead Plaintiff's expert.

[9] Plaintiffs' Counsel include Court-appointed Lead Counsel, Bernstein Litowitz Berger & Grossmann LLP ("Lead Counsel"); liaison counsel, Saxena White P.A; and the Israeli counsel

percentages that courts in the Eleventh Circuit have approved in securities class actions with comparable recoveries. Lead Counsel will also seek payment of Plaintiffs' Counsel's litigation expenses incurred in connection with the Action in an amount not to exceed $300,000, which includes reimbursement of Lead Plaintiff's costs and expenses.

Lead Counsel's fee and expense application will be fully briefed and justified upon filing of a formal motion in accordance with the Preliminary Approval Order. By granting preliminary approval of the proposed Settlement, the Court does not in any way pass upon the reasonableness of any fee or expense application, which will be decided at the Settlement Hearing.

### d) Lead Plaintiff Has Identified All Agreements Made in Connection with the Settlement

In addition to the Settlement Agreement, Lead Plaintiff and Defendants have entered into a confidential Supplemental Agreement regarding requests for exclusion from the Settlement Class (opt-outs). *See* Stipulation ¶ 37. This agreement sets forth the conditions under which Defendants may terminate the Settlement if the opt-outs exceed an agreed-upon threshold. As is standard in securities class actions, such agreements are not made public to avoid incentivizing the formation of a group of opt-outs for the purpose of leveraging the opt-out threshold to exact an individual settlement. *See Hefler v. Wells Fargo & Co.*, 2018 WL 4207245, *7 (N.D. Cal. 2018) ("There are compelling reasons to keep this information confidential in order to prevent third parties from utilizing it for the improper purpose of obstructing the settlement and obtaining higher payouts."); *N.Y. State Teachers' Ret. Sys. v. Gen. Motors Co.*, 315 F.R.D. 226, 240 (E.D. Mich. 2016), ("The opt-out threshold 'is typically not disclosed and is kept confidential to encourage settlement and discourage third parties from soliciting class members to opt out.'"), *aff'd*, 2017 WL 6398014 (6th Cir. Nov. 27, 2017).

In sum, the proposed Settlement satisfies all the requirements of Rule 23(e)(2).

## V.     THE PROPOSED SETTLEMENT CLASS SATISFIES RULE 23

As part of the Settlement, the Parties have stipulated to the certification of the Settlement Class, for purposes of the Settlement only. *See* Stipulation ¶ 2. The Settlement Class consists of

---

who brought a related class action alleging violations of Israeli securities laws in Israel, the law firms of Kalai-Rosen and Manor-Shemesh, who will assist Lead Counsel with matters related to the distribution of settlement funds to Settlement Class Members who purchased OPKO common stock on the Tel Aviv Stock Exchange.

all persons or entities that purchased or otherwise acquired OPKO common stock during the period from September 26, 2013 through September 7, 2018, inclusive (the "Class Period"), including, but not limited to, on either a U.S.-based exchange (including the New York Stock Exchange and the Nasdaq), or on the TASE, and who were damaged thereby. *See* Stipulation ¶ 1(qq).[10]

In determining whether to grant preliminary approval, the Court should also determine whether it "will likely be able to" grant certification to the proposed Settlement Class, for purposes of the Settlement, at final approval. *See* Fed. R. Civ. P. 23(e)(1)(B)(ii).

It is well established that this Court may certify a class "solely for purposes of settlement [if] a settlement is reached before a litigated determination of the class certification issue." *In re Checking Account Overdraft Litig.*, 275 F.R.D 654, 659 (S.D. Fla. 2011). A settlement class, like other certified classes, must satisfy the requirements of Rules 23, *see Borcea*, 238 F.R.D. at 672, but the manageability concerns of Rule 23(b)(3) are not applicable. *See Amchem Prods. v. Windsor*, 521 U.S. 591, 593 (1997) ("Whether trial would present intractable management problems . . . is not a consideration when settlement-only certification is requested.").

As demonstrated below, the proposed Settlement Class satisfies all the applicable requirements of Rule 23(a) and Rule 23(b)(3).

**A.    The Settlement Class Satisfies the Requirements of Rule 23(a)**

Certification is appropriate under Rule 23(a) if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

**1.    The Settlement Class is So Numerous<br>that Joinder Is Impracticable**

The number and location of putative class members is such that it is impracticable to join all of the Settlement Class Members in one lawsuit. *See In re Miller Indus. Sec. Litig.*, 186 F.R.D.

---

[10] Excluded from the Settlement Class are (i) Defendants; (ii) the Officers and directors of OPKO currently and during the Class Period; (iii) members of the Immediate Family of any such excluded persons; (iv) the legal representatives, heirs, agents, affiliates, successors, or assigns of any such excluded persons or entities, and (v) any entity in which any such excluded party has, or had during the Class Period, a controlling interest.  Also excluded from the Settlement Class are any persons and entities who or which exclude themselves by submitting a request for exclusion that is accepted by the Court.

680, 685 (N.D. Ga. 1999) (plaintiffs "need only show that it would be extremely difficult or inconvenient to join all members of the class"). OPKO shares were actively traded on the NYSE (from the beginning of the Class Period until June 24, 2016) and the Nasdaq (from June 24, 2016 through the end of the Class Period), as well as on the TASE throughout the Class Period. As of November 1, 2018, OPKO had approximately 560 million shares of Common Stock outstanding. While the exact number of Settlement Class Members is unknown to Lead Plaintiff, Lead Plaintiff believes that there are at least tens of thousands of members of the Settlement Class. Accordingly, the members of the Settlement Class are so numerous that their joinder would be impracticable. *See AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676, 684 (N.D. Ala. 2005) (finding that class of at least eighty bondholders met numerosity requirement).

### 2.   There Are Common Questions of Law and Fact

The commonality requirement is satisfied as long as the proposed class members share at least one common question of law or fact.  *See Hicks v. Client Servs., Inc.*, 2008 WL 5479111, at *5 (S.D. Fla. Dec. 11, 2008). It "does not require that all of the questions of law or fact raised by the case be common to all the plaintiffs." *Id*. This requirement is satisfied when a plaintiff alleges that "[d]efendants have engaged in a standardized course of conduct that affects all class members." *Id*.  These requirements are satisfied here, where Defendants issued a series of alleged material misstatements to investors, which allegedly artificially inflated or maintained the price of OPKO common stock.   Common questions of law and fact include (a) whether the federal securities laws were violated by Defendants' alleged acts; (b) whether statements made by Defendants during the Class Period misrepresented or omitted material facts; (c) whether Defendants acted with scienter; and (d) to what extent the members of the Settlement Class have suffered damages, as well as the proper measure of damages. The commonality requirement is met.

### 3.   Lead Plaintiff's Claims Are Typical of Those of the Settlement Class

Typicality is established where "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007).

Here, the alleged injuries to Lead Plaintiff and the other members of the Settlement Class are attributable to the same alleged course of conduct by Defendants, and liability for this conduct

is predicated on the same legal theories. Lead Plaintiff alleges that it, like the rest of the Settlement Class, paid artificially inflated prices for OPKO common stock during the Class Period as a result of Defendants' material misrepresentations and omissions. As such, Lead Plaintiff "ha[s] the incentive to prove all elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 238 (S.D.N.Y. 2006). Moreover, the alleged damages sustained by Lead Plaintiff and other members of the Settlement Class arise from the same course of misconduct. Accordingly, Lead Plaintiff satisfies the typicality requirement. *See In re Amerifirst Sec. Litig.*, 139 F.R.D. 423, at 429 (S.D. Fla. 1991) ("As long as Plaintiffs assert, as they do here, that Defendants committed the same wrongful acts in the same manner against all members of the class, they establish the necessary typicality.").

Lead Plaintiff purchased shares of OPKO common stock on both the TASE and U.S. exchanges during the Class Period and thus has claims that are typical of both of these groups of Settlement Class Members.  In any event, there is no substantial difference in interests between the two groups of class members because the same set of alleged misstatements by Defendants affected the price of OPKO common stock comparably on both markets, the shares on both markets declined in a similar manner when the truth was revealed, and the standards for proving a violation of Israeli securities law correspond to the U.S. requirements.

#### 4.     Lead Plaintiff Will Fairly and Adequately Protect the Interests of the Settlement Class

Adequacy of representation is measured by two standards: (i) whether the claims of the proposed class representatives conflict with those of the class; and (ii) whether their counsel are qualified, experienced, and generally able to conduct the litigation. *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992); *Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at *15 (S.D.N.Y. Mar. 24, 2014). Both prongs of the adequacy test are met here.

First, there is no antagonism or conflict between Lead Plaintiff and the proposed Settlement Class. Lead Plaintiff and Settlement Class Members purchased OPKO common stock during the Class Period and were injured by the same alleged misrepresentations and omissions. If Lead Plaintiff were to prove its claims at trial, it would also prove the Settlement Class's claims. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013) (the investor class "will prevail or fail in unison" because claims are based on common misrepresentations and omissions). Thus, the interests of Lead Plaintiff and the Settlement Class are aligned, and they share the

common objective of maximizing their recovery from Defendants. *See In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members.").

Second, Lead Plaintiff has demonstrated its commitment to this litigation by retaining qualified counsel and vigorously litigating the Action. Lead Counsel is highly experienced in securities litigation and has successfully prosecuted many complex class actions. Accordingly, Rule 23(a)(4) is satisfied.

**B.      The Settlement Class Satisfies the Requirements of Rule 23(b)(3)**

Rule 23(b)(3) authorizes class certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The proposed Settlement Class satisfies these requirements.

**1.      Common Legal and Factual Questions Predominate**

Class-wide issues predominate "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). "While Rule 23(b)(3) requires that common issues of law and fact predominate, it does not require that there be an absence of individual issues." *Veeco*, 235 F.R.D. at 240. This "test [is] readily met in certain cases alleging . . . securities fraud." *Amchem*, 521 U.S. at 625. For predominance, "[i]t is not necessary that all questions of fact or law be common, but only that some questions are common and that they predominate over individual questions." *In re Theragenics Corp. Sec. Litig.*, 205 F.R.D. 687, 697 (N.D. Ga. 2002). Lead Plaintiff submits that there are no significant – let alone predominant – individual issues in this case. Indeed, it is difficult to discern any liability issues not common to all Settlement Class Members.

Here, "the critical issues for establishing Defendants' liability include whether the Defendants (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury. Each of these issues is susceptible of

generalized proof and, accordingly, the predominance requirement . . . is satisfied." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *11 (S.D.N.Y. Dec. 23, 2009); *see also Veeco*, 235 F.R.D. at 240 ("[Q]uestions of fact regarding the content and implications of defendants' statements and defendants' intent in making these statements are central to the claims of each member of the putative class. Any individual issues will necessarily be secondary."). If Lead Plaintiff and each Settlement Class Member were to bring individual actions, they would each be required to prove the same wrongdoing by Defendants in order to establish liability.

### 2.        A Class Action Is Superior to Other Methods of Adjudication

Rule 23(b)(3) sets forth the following non-exhaustive factors to be considered in making a determination of whether class certification is the superior method of litigation:  "(A) the class members' interests in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

Here, the benefits of presenting the claims of Settlement Class Members through a class action is substantial, as Settlement Class Members are geographically dispersed and likely number in the tens of thousands, but many have not been damaged to a degree that would make bringing individual lawsuits economically feasible. *See In re BellSouth Corp. Sec. Litig.*, 2006 WL 870362, *4 (N.D. Ga. April 3, 2006) (finding a class action to be the superior method for litigating a federal securities action because "prosecution by individual shareholders would be prohibitive from both the individual plaintiff's and the court's perspectives."); *In re Blech Sec. Litig.*, 187 F.R.D. 97, 107 (S.D.N.Y. 1999) ("violations of the federal securities laws, such as those alleged in the Complaint, inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible."). Further, a class action will avoid duplicative litigation and save substantial judicial resources. Finally, since this is a request for class certification only for purposes of settlement, the Court need not inquire as to whether the case, if tried, would present management problems.  *See Amchem*, 521 U.S. at 620.

In sum, the proposed Settlement Class meets all of the requirements of Rules 23(a) and (b)(3) and is appropriate for certification for purposes of the Settlement.

## VI.     THE COURT SHOULD APPROVE THE PROPOSED FORM OF NOTICE AND PLAN FOR PROVIDING NOTICE TO THE SETTLEMENT CLASS

As outlined in the proposed Preliminary Approval Order, if the Court grants preliminary approval, the Claims Administrator will mail the Notice and Claim Form (Exhibits 1 and 2 to the Preliminary Approval Order) to all Settlement Class Members who can be identified with reasonable effort, as well as post the Notice and the Claim Form on a website to be developed for the Settlement. In addition, Hebrew-language versions of the Notice and the Claim Form will be mailed to potential Settlement Class Members with mailing addresses in Israel.  The Notice will advise Settlement Class Members of: (i) the pendency of the class action; (ii) the essential terms of the Settlement; and (iii) information regarding Lead Counsel's application for attorneys' fees and expenses.  The Notice also will provide specifics on the date, time, and place of the Settlement Hearing and set forth the procedures for objecting to the Settlement, the proposed Plan of Allocation and/or the motion for attorneys' fees and expenses, and the procedure for requesting exclusion from the Settlement Class.

In addition to the mailing of the Notice and Claim Form, a Summary Notice will be published in *The Wall Street Journal* and transmitted over the *PR Newswire* and a Hebrew-language version of the Settlement Notice will be published in a daily Israeli paper.[11]

The form and manner of providing notice to the Settlement Class satisfy the requirements of due process, Rule 23, and the PSLRA, 15 U.S.C. § 78u-4(a)(7).  The Notice contains the specific information required by Rule 23(c)(2)(B) and the PSLRA, and will "fairly apprise the prospective members of the class of the terms of the proposed settlement[s] and of the options that are open to them in connection with the proceedings."  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 114 (2d Cir. 2005).  The manner of providing notice, which includes individual notice by first-class mail to all class members who can be reasonably identified, supplemented by additional publication and internet notice, represents the best notice practicable under the circumstances and satisfies the requirements of due process and Rule 23.  *See Aranaz v. Catalyst Pharm. Partners Inc.*, 2014 WL 11870214, at *2-3 (S.D. Fla. Dec. 3, 2014) (notice distributed by first class mail to all class members "who can be identified with reasonable effort . . . constitute[s] the best notice

---

[11] The Parties have also agreed that, no later than ten calendar days following the filing of the Settlement Agreement with the Court, Defendants shall serve the notice required under the Class Action Fairness Act, 28 U.S.C. § 1715 *et seq.* ("CAFA").  *See* Stipulation ¶ 21.

practicable under the circumstances; and constitute[s] due and sufficient notice to all persons and entities entitled thereto").

Lead Plaintiff proposes that JND Legal Administration ("JND") administer the notice and claims process. JND is an independent settlement and claims administrator that Lead Counsel selected as the proposed Claims Administrator after a competitive bidding process. If the Court preliminarily approves the Settlement, OPKO will provide contact information of potential Settlement Class Members and JND will disseminate the Notice and Claim Form to all identified potential Settlement Class Members. JND will also utilize a list of the largest and most common banks, brokerage firms, and nominees that purchase securities on behalf of beneficial owners to facilitate the dissemination of Notice.

## VII.   PROPOSED SCHEDULE OF SETTLEMENT EVENTS

The Parties propose a schedule for Settlement-related events as set forth in Appendix A. The timing of events is determined by the date the Preliminary Approval Order is entered and the date the Settlement Hearing is scheduled. If the Court grants preliminary approval as requested, the only date the Court need schedule is the date for the Settlement Hearing. *See* Preliminary Approval Order ¶ 5. The remaining dates will be based thereon, as set forth in the proposed order.

Lead Plaintiff requests that the Court schedule the hearing 105 days after entry of the Preliminary Approval Order or its earliest convenience after that date. Thus, if the Court enters the Preliminary Approval Order by July 6, 2020, Lead Plaintiff requests that the Settlement Hearing be scheduled for October 19, 2020, or as soon thereafter as possible.

## VIII.   CONCLUSION

Lead Plaintiff respectfully requests that the Court enter the Parties' agreed-upon proposed Preliminary Approval Order, which will provide for: (i) preliminary approval of the Settlement; (ii) approval of the form and manner of giving notice of the Settlement to the Class; and (iii) a hearing date and time to consider final approval of the Settlement and related matters.

Dated: June 29, 2020

**SAXENA WHITE P.A.**

*/s/ Brandon T. Grzandziel*
Joseph E. White, III
Brandon T. Grzandziel
7777 Glades Road
Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (888) 478-6711
Email: jwhite@saxenawhite.com
Email: brandon@saxenawhite.com

*Liaison Counsel for Lead Plaintiff The Amitim Funds*

**BERNSTEIN   LITOWITZ   BERGER & GROSSMANN LLP**

*/s/ John Rizio-Hamilton*
Avi Josefson (*pro hac vice*)
John Rizio-Hamilton (*pro hac vice*)
Adam D. Hollander (*pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Email: avi@blbglaw.com
Email: johnr@blbglaw.com
Email: adam.hollander@blbglaw.com

*Lead Counsel for Lead Plaintiff The Amitim Funds*

**Appendix A**

**Proposed Schedule of Settlement Events**

| Event | Proposed Timing |
|---|---|
| Deadline for initial mailing of the Notice and Claim Form to Settlement Class Members (which date shall be the "Notice Date") (Preliminary Approval Order ¶ 7(b)) | 15 business days after entry of the Preliminary Approval Order |
| Deadline for publishing the Summary Notice (Preliminary Approval Order ¶ 7(e)) | 10 business days after the Notice Date |
| Deadline for filing of papers in support of final approval of the Settlement and Plan of Allocation, and Lead Counsel's motion for attorneys' fees and Litigation Expenses (Preliminary Approval Order ¶ 28) | 35 calendar days before the Settlement Hearing |
| Deadline for receipt of requests for exclusion or objections (Preliminary Approval Order ¶¶ 15, 18, 19) | 21 calendar days before the Settlement Hearing |
| Deadline for filing reply papers (Preliminary Approval Order ¶ 28) | 7 calendar days before the date set for the Settlement Hearing |
| Settlement Hearing (Preliminary Approval Order ¶ 5) | To be selected by the Court, but no earlier than 105 calendar days after the date of entry of the Preliminary Approval Order |
| Postmark deadline for submitting Claim Forms (Preliminary Approval Order ¶ 11) | 120 calendar days after the Notice Date |