**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:18-cv-23786-MARTINEZ-OTAZO-REYES**

---

CHARLES STEINBERG, Individually and on
Behalf of All Others Similarly Situated,

                 Plaintiff,

v.

OPKO HEALTH, INC., PHILLIP FROST,
ADAM LOGAL, and JUAN RODRIGUEZ,

                 Defendants.

---

**LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT
AND PLAN OF ALLOCATION, AND INCORPORATED MEMORANDUM OF LAW**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES. ..................................................................................................... iii

I.   PRELIMINARY STATEMENT .................................................................................... 1

II.  ARGUMENT ................................................................................................................ 4

    A.   The Proposed Settlement Warrants Final Approval ............................................ 4

        1.   Lead Plaintiff and Lead Counsel Have Adequately
            Represented the Settlement Class ................................................................ 6

        2.   The Settlement Was Reached After Arm's-Length
            Negotiations with the Assistance of an Experienced
            Mediator ...................................................................................................... 6

        3.   The Relief that the Settlement Provides for the Settlement
            Class is Adequate, Taking into Account the Costs and
            Risks of Further Litigation and All Other Relevant Factors ...................... 8

            a)   The Risks of Establishing Liability and Damages
                Support Approval of the Settlement ............................................... 9

                (1)   Risks to Proving Liability .................................................. 9

                (2)   Risks to Proving Loss Causation and Damages ............... 11

            b)   Risks Related to OPKO's Ability to Pay Support
                Approval of the Settlement ........................................................... 12

            c)   The Settlement is Reasonable in Light of the Likely
                Recoverable Damages .................................................................. 13

            d)   The Costs and Delays of Continued Litigation
                Support Approval of the Settlement ............................................. 13

            e)   All Other Factors Set Forth in Rule 23(c)(2)(C)
                Support Approval of the Settlement ............................................. 14

         4.   The Settlement Treats Settlement Class Members Equitably ................... 16

        5.   Other Factors Considered by the Eleventh Circuit Support
             Approval of the Settlement ....................................................................... 16

    B.   The Plan of Allocation is Fair and Reasonable ................................................. 17

    C.   The Settlement Class Should be Certified ......................................................... 18

    D.   Notice to the Settlement Class Satisfied Rule 23 and Due Process .................. 19

III.    CONCLUSION..............................................................................................................19

## **TABLE OF AUTHORITIES**

CASES                                                                                    PAGE(S)

*In re Airgate PCS, Inc. Sec. Litig.*,
   389 F. Supp. 2d 1360 (N.D. Ga. 2005) ...................................................................10

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)..........................................................................................6

*Aranaz v. Catalyst Pharm. Partners Inc.*,
   2014 WL 11870214 (S.D. Fla. Dec. 3, 2014) ..........................................................19

*Bennett v. Behring Corp.*,
   737 F.2d 982 (11th Cir. 1984) .................................................................5, 8, 16

*Berman v. Gen. Motors LLC*,
   2019 WL 6163798 (S.D. Fla. Nov. 18, 2019)......................................................7, 16

*In re Biolase, Inc. Sec. Litig.*,
   2015 WL 12720318 (C.D. Cal. Oct. 13, 2015)..........................................................13

*Borcea v. Carnival Corp.*,
   238 F.R.D. 664 (S.D. Fla. 2006) ...........................................................................7

*In re Checking Acct. Overdraft Litig.*,
   830 F. Supp. 2d 1330 (S.D. Fla. 2011) ................................................................5, 7

*In re Chicken Antitrust Litig. Am. Poultry*,
   669 F.2d 228 (5th Cir. 1982) ...............................................................................17

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
   2020 WL 256132 (N.D. Ga. Mar. 17, 2020)........................................................5, 6, 7

*Faught v. Am. Home Shield Corp.*,
   668 F.3d 1233 (11th Cir. 2012) ...........................................................................5

*In re HealthSouth Corp. Sec. Litig.*,
   572 F.3d 854 (11th Cir. 2009) ...........................................................................4

*Jairam v. Colourpop Cosmetics, LLC*,
   2020 WL 5848620 (S.D. Fla. Oct. 1, 2020)...........................................................7

*Kirkpatrick v. J.C. Bradford Co.*,
   827 F.2d 718 (11th Cir. 1987) ...........................................................................6

*Kuhr v. Mayo Clinic Jacksonville*,
   2020 WL 5912350 (M.D. Fla. Oct. 6, 2020) ..........................................................19

*Lipuma v. Am. Express Co.*,
  406 F. Supp. 2d 1298 (S.D. Fla. 2005) .................................................................16

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
  233 F.R.D. 306 (E.D.N.Y. 2006) ...........................................................................8

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) ............................................................................11

*Nelson v. Mead Johnson & Johnson Co.*,
  484 F. App'x 429 (11th Cir. 2012) .........................................................................7

*In re NetBank, Inc. Sec. Litig.*,
  2011 WL 13353222 (N.D. Ga. Nov. 9, 2011) ........................................................8

*Perez v. Asurion Corp.*,
  501 F. Supp. 2d 1360 (S.D. Fla. 2007) ...............................................................7, 8

*Preman v. Pollo Operations, Inc.*,
  2018 WL 3151673 (M.D. Fla. Apr. 12, 2018) ......................................................16

*Robbins v. Koger Props., Inc.*,
  116 F.3d 1441 (11th Cir. 1997) ............................................................................14

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2020 WL 4196468 (S.D.N.Y. July 21, 2020) .......................................................16

*Thorpe v. Walter Inv. Mgmt. Corp.*,
  2016 WL 10518902 (S.D. Fla. Oct. 17, 2016) ......................................................13

*In re U.S. Oil & Gas Litig.*,
  967 F.2d 489 (11th Cir. 1992) ................................................................................5

*In re Veeco Instruments Inc. Sec. Litig.*,
  2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ..........................................................8

*Vinh Nguyen v. Radient Pharms. Corp.*,
  2014 WL 1802293 (C.D. Cal. May 6, 2014) ........................................................17

*In re Vivendi Universal SA Securities Litigation*,
  765 F. Supp. 2d 520 (S.D.N.Y. 2011) ..................................................................14

*Wal-Mart Stores, Inc. v. Visa U.S.A.*,
  396 F.3d 96 (2d Cir. 2005) ...................................................................................19

*Yang v. Focus Media Holding Ltd.*,
  2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014) ....................................................7, 17

**STATUTES**

Private Securities Litigation Reform Act of 1995,
    15 U.S.C. § 78u-4(a)(7) ..........................................................................................19

28 U.S.C. § 1658(b) .........................................................................................................10

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(c) ........................................................................................................19

Fed. R. Civ. P. 23(e) ................................................................................................. *passim*

In accordance with Rule 23(e)(2) of the Federal Rules of Civil Procedure, Lead Plaintiff, the Amitim Funds, on behalf of itself and the Settlement Class, respectfully submits this motion for: (1) final approval of the proposed settlement resolving the Action in exchange for payment of $16.5 million in cash for the benefit of the Settlement Class (the "Settlement"), and (2) approval of the proposed plan of allocation of the proceeds of the Settlement.[1]

## MEMORANDUM OF LAW

## I.    PRELIMINARY STATEMENT

Subject to Court approval, Lead Plaintiff has agreed to settle the Action in exchange for a cash payment of $16,500,000, which has been deposited into an escrow account.  Lead Plaintiff respectfully submits that the proposed Settlement is fair, reasonable, and adequate and satisfies all the standards for final approval under Rule 23 of the Federal Rules of Civil Procedure.  As detailed in the accompanying Rizio-Hamilton Declaration and summarized below, the Settlement is a favorable result for the Settlement Class in light of the significant risks posed by ongoing litigation, including the substantial risks in proving the falsity of Defendants' statements, scienter, and loss causation; potential challenges in recovering a substantial judgment in light of limits on Defendants' insurance and OPKO's uncertain financial position; and the amount of potential damages that could likely be proven at trial.  ¶¶ 36-65.

The Settlement was reached only after lengthy arm's-length settlement negotiations between experienced counsel, which were assisted by Jed D. Melnick, Esq. of JAMS, an experienced and highly respected class-action mediator.  The mediation process included the exchange of detailed written mediation statements concerning liability, damages, and Defendants' ability to pay; a full-day mediation session; and extended negotiations after the mediation session that were facilitated by Mr. Melnick.  ¶¶ 29-31.  This process ultimately culminated in Mr. Melnick issuing a mediator's recommendation that the Action be settled for $16.5 million, which the Parties accepted.  ¶ 31.  Mr. Melnick has submitted a Declaration in support of the Settlement stating that he believes that the "entire mediation process involved significant disputed issues and hard-fought, arm's-length negotiations;" and that he recommends the Settlement as "a reasonable resolution of

---

[1] Unless otherwise noted, capitalized terms shall have the meanings provided in the Stipulation and Agreement of Settlement dated June 26, 2020 (ECF No. 112-1) (the "Stipulation"), or in the Declaration of John Rizio-Hamilton (the "Rizio-Hamilton Declaration" or "Rizio-Hamilton Decl."), filed herewith.  In this memorandum, citations to "¶ __" refer to paragraphs in the Rizio-Hamilton Declaration and citations to "Ex. __" refer to exhibits to the Rizio-Hamilton Declaration.

the Action for the Parties based on my involvement in the negotiations, review and analysis of the Parties' mediation submissions, extensive communications with the parties, and assessment of the risks inherent in this litigation." Declaration of Jed D. Melnick (Ex. 1), at ¶ 8.

Before the Settlement was agreed to, Lead Counsel had (i) conducted an extensive investigation into the claims asserted, including through a detailed review of public documents, the review and analysis of a detailed SEC complaint based on a regulatory investigation, and interviews with dozens of possible witnesses; (ii) researched and drafted a detailed consolidated complaint; (iii) fully briefed Defendants' motion to dismiss the Complaint; (iv) engaged in the mediation process summarized above; and (v) consulted extensively with an expert in damages and loss causation and a valuation expert who analyzed OPKO's financial condition in order to inform Lead Plaintiff's understanding of the Company's potential ability to pay to a larger settlement or judgment. ¶¶ 5, 19-31. As a result of these efforts, Lead Plaintiff and Lead Counsel were knowledgeable about the strengths and risks of the case when the Settlement was reached.

Lead Plaintiff and Lead Counsel believe that the $16.5 million Settlement is particularly favorable given the substantial risks of continued litigation. In agreeing to settle the Action, Lead Plaintiff and Lead Counsel made an informed evaluation of those risks. Lead Plaintiff respectfully submits that the Settlement appropriately balances Lead Plaintiff's objective of securing the greatest possible monetary recovery for the Settlement Class against the significant risk that the Settlement Class could receive a smaller recovery—or no recovery at all—had litigation continued. ¶¶ 61-65. While Lead Plaintiff believes its claims had merit, it faced substantial risks that it might not succeed on the pending motion to dismiss, on an expected motion for summary judgment, at trial, and on appeal. ¶¶ 36-65. Moreover, even if Lead Plaintiff were successful at each stage of litigation, any such recovery would likely not be obtained for at least several years. There were also serious risks that Lead Plaintiff might be unable to collect on a larger judgment after these years of additional litigation in light of OPKO's uncertain financial condition and limits on Defendants' insurance. ¶¶ 54-60.

Specifically, as to liability, Lead Plaintiff faced challenges in proving that Defendants made materially false or misleading statements or material omissions, and that Defendants made the misstatements or omissions with fraudulent intent or were reckless in making them. ¶¶ 38-49. Defendants contended that the SEC complaint that gave rise to this Action identified a different individual as the primary strategist who orchestrated the alleged stock manipulation schemes, and

contained only sparse allegations about OPKO and Dr. Frost's involvement and no allegations that investors in OPKO were misled.  ¶¶ 40, 44, 46.  Moreover, Defendants would contend that the SEC complaint's allegations about OPKO and Dr. Frost's involvement were factually flawed and that the actual facts would not support Lead Plaintiff's fraud claims, but would show that Defendants were unaware of the alleged stock manipulation. ¶¶ 40, 44-45.  Defendants pointed to the fact that OPKO and Dr. Frost did not engage in any coordinated trading to "pump" the stocks at issue; OPKO did not sell any of the stock of the two companies at issue; Dr. Frost did not sell any stock in one of the two companies at issue and sold only small portions of his holdings in the other company; that both Defendants continued to invest heavily in the companies after the purported stock manipulation; and that Dr. Frost continued to purchase OPKO shares during the Cass Period.  *Id*.  Defendants would argue that these facts made it implausible that Defendants were involved in the scheme and undercut any inference they acted with scienter.  *Id*.  Defendants would also contend that their challenged statements about the "strategic" nature of OPKO's investments in early-stage companies were either non-actionable "puffery" or were not false, and that the claims related to other alleged misstatements were barred by the five-year statute of repose. ¶¶ 41-42.

Defendants further argued that Lead Plaintiff could not establish loss causation because the SEC complaint could not act as a corrective disclosure of the alleged misstatements.  In support of this argument, Defendants contended that: (1) the SEC complaint contained only unproven allegations, and (2) the underlying facts in the SEC complaint about OPKO and Dr. Frost's investments in the companies whose stocks were allegedly manipulated were already known to the market.  ¶¶ 50-53.  If Lead Plaintiff could not establish loss causation, the class would not be able to recover any damages.  *Id*.

Finally, in addition to these risks, Lead Plaintiff also faced substantial risks that it might be unable to recover on any judgment substantially larger than the Settlement.  ¶¶ 54-60.  There was a coverage dispute between Defendants and their insurers that, if litigated and decided adversely to OPKO, would have left no insurance available to the class in this Action.  ¶ 55.  Even if OPKO prevailed in the insurance dispute, OPKO's insurance was limited and was a wasting asset that would have continued to have been reduced if litigation continued.  *Id*.  Moreover, OPKO itself had only limited cash available to contribute to any settlement or other recovery and its financial condition was uncertain.  ¶¶ 56-57.  Thus, if the available insurance was further reduced or

3

exhausted through the costs of continued litigation, or was unavailable as a result of the coverage dispute, there was a risk that the class might recover substantially less than the Settlement or nothing at all after additional years of protracted litigation.  ¶¶ 58, 60.

The Settlement has the full support of the Court-appointed Lead Plaintiff, a sophisticated institutional investor that took an active role in supervising the litigation and participated in settlement negotiations.  *See* Declaration of Ronen Hirsch on behalf of the Amitim Funds (Ex. 2) ("Hersch Decl."), at ¶¶ 2-6.  Further, although the deadline to request exclusion from the Settlement Class or object to the Settlement has not yet passed, to date, no Settlement Class Members have objected to the Settlement and three requests for exclusion have been received. ¶ 71; Segura Decl. ¶ 13.

Given these considerations and the other factors discussed below, Lead Plaintiff respectfully submits that the Settlement is fair, reasonable, and adequate and warrants final approval by the Court.  Additionally, Lead Plaintiff requests the Court approve the Plan of Allocation, which was set forth in the Notice mailed to potential Settlement Class Members.  The Plan of Allocation, which Lead Counsel developed in consultation with Lead Plaintiff's damages expert, provides a reasonable method for allocating the Net Settlement Fund among Settlement Class Members who submit valid claims based on damages they suffered on purchases of OPKO common stock.

## II.   ARGUMENT

The Rizio-Hamilton Declaration is cited to throughout this brief, and is an integral part of this submission. The Court is respectfully referred to it for a more detailed description of, among other things: the history of the Action (¶¶ 13-35); the nature of the claims asserted (¶¶ 22, 24); the negotiations leading to the Settlement (¶¶ 29-33); the risks and uncertainties of continued litigation (¶¶ 36-65); and the terms of the Plan of Allocation (¶¶ 72-83).

### A.   The Proposed Settlement Warrants Final Approval

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class-action claims.  *See* Fed. R. Civ. P. 23(e).  A class-action settlement should be approved if the court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

The Eleventh Circuit has recognized that public and judicial policy favor the settlement of disputed claims among private litigants, particularly in class actions.  *See In re HealthSouth Corp. Sec. Litig.*, 572 F.3d 854, 862 (11th Cir. 2009) ("Public policy strongly favors the pretrial

settlement of class action lawsuits."); *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) (same); *In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330, 1341 (S.D. Fla. 2011) (the Court's "Rule 23(e) analysis should be 'informed by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement'").

Rule 23(e)(2), as amended on December 1, 2018, provides that the Court should determine whether a proposed settlement is "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Historically, the Eleventh Circuit has held that district courts should consider following factors set forth in *Bennett v. Behring Corp.* in evaluating a class-action settlement:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

737 F.2d 982, 986 (11th Cir. 1984); *accord Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1240 (11th Cir. 2012).

The Advisory Committee Notes to the 2018 amendments to the Federal Rules of Civil Procedure indicate that the four factors set forth in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by the Court of Appeals, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e)(2) Advisory Committee Notes to 2018 Amendments.

Accordingly, Lead Plaintiff will discuss the fairness, reasonableness, and adequacy of the Settlement principally in relation to the factors set forth in Rule 23(e)(2), but will also discuss the application of relevant, non-duplicative *Bennett* factors. *See In re Equifax Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132, at *10 (N.D. Ga. Mar. 17, 2020) (reviewing final approval of class action settlement under both the Rule 23(e)(2) factors and *Bennett* factors).

All of the applicable factors support approval of the Settlement here.

### 1. Lead Plaintiff and Lead Counsel Have Adequately Represented the Settlement Class

In evaluating a class action settlement, the Court should consider whether "the class representatives and class counsel have adequately represented the class."  Fed. R. Civ. P. 23(e)(2)(A).  Courts consider (1) whether class representatives have interests antagonistic to the interests of other class members; and (2) whether class counsel has the necessary qualifications and experience to lead the litigation.  *See, e.g., Kirkpatrick v. J.C. Bradford Co.*, 827 F.2d 718, 726 (11th Cir. 1987); *Equifax*, 2020 WL 256132, at *5.

Here, there is no antagonism or conflict between Lead Plaintiff and the proposed Settlement Class.  Lead Plaintiff has claims that are typical of and coextensive with those of other Settlement Class Members, and has no interests antagonistic to the interests of other members of the Settlement Class.  Lead Plaintiff and the other Settlement Class Members all purchased OPKO common stock during the Class Period and were allegedly damaged by the same alleged false and misleading statements.  If Lead Plaintiff proved its claims at trial, it would also prove the Settlement Class's claims.  *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (the investor class "will prevail or fail in unison" because claims are based on common misrepresentations and omissions).

Moreover, Lead Plaintiff and Lead Counsel have adequately represented the Settlement Class in their vigorous prosecution of the Action and in the negotiation and achievement of the Settlement.  Lead Counsel BLB&G is highly qualified and experienced in securities litigation, as set forth in its firm resume (see Ex. 4A-3 to the Rizio-Hamilton Declaration) and was able to successfully conduct the litigation against skilled opposing counsel and obtain a favorable settlement.  Accordingly, the Settlement Class was adequately represented.

### 2. The Settlement Was Reached After Arm's-Length Negotiations with the Assistance of an Experienced Mediator

In weighing approval of a class action settlement, the Court must consider whether the settlement "was negotiated at arm's length."  Fed. R. Civ. P. 23(e)(2)(B).

The Settlement here was reached only after extensive arm's-length negotiations between the Parties, which were conducted with the assistance of an experienced mediator.  The mediation process included the exchange of detailed mediation statements and a full-day mediation session under the auspices of Jed D. Melnick of JAMS, one of the country's preeminent mediators of

securities class actions.  ¶¶ 29-31.  After no agreement was reached at the mediation session, the Parties engaged in further months of discussions with the mediator.  ¶ 31.  The proposed Settlement is the result of the mediator's recommendation.  *Id*.

These facts strongly support the conclusion that the Settlement is fair.  *See Berman v. Gen. Motors LLC*, 2019 WL 6163798, at *4 (S.D. Fla. Nov. 18, 2019) ("the Settlement was reached with the assistance of a neutral mediator with substantial experience mediating class actions, which further demonstrates the absence of collusion"); *Equifax*, 2020 WL 256132, at *6 ("readily conclud[ing]" that a settlement was negotiated at arm's-length where mediation was conducted by an experienced mediator); *Yang v. Focus Media Holding Ltd.*, 2014 WL 4401280, at *5 (S.D.N.Y. Sept. 4, 2014) ("The participation of this highly qualified mediator [Mr. Melnick] strongly supports a finding that negotiations were conducted at arm's length and without collusion."); *Borcea v. Carnival Corp.*, 238 F.R.D. 664, 675 (S.D. Fla. 2006) (settlement reached after mediation was "the product of good-faith, arm's length negotiations rather than collusion or overreaching by the parties").

In addition, Lead Plaintiff and Lead Counsel were sufficiently knowledgeable about the strengths and weaknesses of the case prior to reaching the agreement to settle.  Lead Counsel had conducted an extensive investigation regarding the alleged fraud; prepared and filed a detailed consolidated complaint; fully briefed defendants' motion to dismiss; consulted with experts; engaged directly with Defendants' arguments at the mediation; and gathered and analyzed data about Defendants' ability to pay. ¶¶ 19-31.

Accordingly, the Court should give considerable weight to Lead Plaintiff and Lead Counsel's judgment that the Settlement is in the best interests of the Settlement Class.  Indeed, "[i]n evaluating a proposed class action settlement, the Court will not substitute its business judgment for that of the parties." *Checking Acct. Overdraft,* 830 F. Supp. 2d at 1341.  Lead Counsel's substantial experience in cases of this nature gives further weight to its judgment that the Settlement is fair and reasonable.  *See Jairam v. Colourpop Cosmetics, LLC*, 2020 WL 5848620, at *3 (S.D. Fla. Oct. 1, 2020) ("In evaluating a proposed class action settlement, 'the district court may rely upon the judgment of experienced counsel for the parties.'") (quoting *Nelson v. Mead Johnson & Johnson Co.*, 484 F. App'x 429, 434 (11th Cir. 2012)); *see also Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1384 (S.D. Fla. 2007) ("[a] district court properly considers the judgment of experienced counsel when asked to approve a class action settlement").

Finally, the fact that Lead Plaintiff is a sophisticated institutional investor, of the type favored by Congress when it passed the PSLRA, strengthens the force of its recommendation that the Settlement be approved.  *See In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) ("a settlement reached . . . under the supervision and with the endorsement of a sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness….'").

### 3. The Relief that the Settlement Provides for the Settlement Class is Adequate, Taking into Account the Costs and Risks of Further Litigation and All Other Relevant Factors

In determining whether a settlement is "fair, reasonable, and adequate," the Court must consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal."  Fed. R. Civ. P. 23(e)(2)(C).[2]

Courts have recognized that complexity of securities class actions renders this type of litigation "notably difficult and notoriously uncertain."  *In re NetBank, Inc. Sec. Litig.*, 2011 WL 13353222, at *3 (N.D. Ga. Nov. 9, 2011).  Accordingly, "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation."  *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006).

As discussed in detail in the Rizio-Hamilton Declaration and below, continued litigation of the Action presented a number of significant risks to Lead Plaintiff and the Settlement Class. First, there were significant risks that Lead Plaintiff would be unable to establish liability and loss causation and prove damages.  ¶¶ 37-53.  In addition, OPKO's uncertain financial condition and limitations on Defendants' insurance created serious risks that—even if Lead Plaintiff succeeded in obtaining a judgment through litigation—it might be unable to recover on any judgment against OPKO that was substantially larger than the Settlement achieved.  ¶¶ 54-60.  Moreover, continuing the litigation through trial and appeals would impose substantial additional costs on the Settlement Class and would result in extended delays before any recovery could be achieved.  ¶¶ 63-64, 99. The Settlement, which provides an immediate $16.5 million cash payment for the benefit of the

---

[2] This factor under Rule 23(e)(2)(C) encompasses four of the six factors of the traditional *Bennett* analysis:  "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; [and] (4) the complexity, expense and duration of litigation."  737 F.2d at 986.

Settlement Class, avoids these risks and further costs and delays.  The Settlement is also reasonable when considered in relation to the range of potential recoveries that might be obtained if Lead Plaintiff prevailed at trial, which was far from certain.

**a)      The Risks of Establishing Liability and Damages Support Approval of the Settlement**

While Lead Plaintiff and Lead Counsel believe that the claims asserted against Defendants in the Action are meritorious, they recognize that Defendants' motion to dismiss was still pending at the time of the Settlement.  That motion, as well as the continued litigation of the Action through a motion for class certification, an expected motion for summary judgment, trial, and appeal, presented a number of substantial risks that might have prevented the Settlement Class from recovering in this Action.  Lead Plaintiff faced challenges in proving that Defendants made materially false or misleading statements or material omissions, that Defendants made the misstatements or omissions with fraudulent intent or were reckless in making them, and in proving loss causation and damages.

**(1)      Risks to Proving Liability**

**Falsity.**  Defendants argued in their motion to dismiss, and would have continued to argue, that Defendants' alleged false statements regarding OPKO's investments in early-stage companies and the Company's investment strategy were either not actionable or not false and misleading. ¶¶ 38-42.  First, Defendants contended that Lead Plaintiff had not adequately alleged in the Complaint and would not be able prove at trial that Defendants had, in fact, participated in the alleged pump-and-dump schemes described in the SEC Action, which was a necessary predicate to establishing the falsity of Defendants' challenged statements about OPKO's investments in the early-stage companies.  ¶ 40.  Defendants vigorously denied their participation in the alleged schemes and denied the accuracy of the allegations in the SEC complaint as to their conduct. Defendants argued that neither Dr. Frost nor OPKO had engaged in any coordinated trading; OPKO sold no shares into the alleged "dumps"; Dr. Frost sold no shares into one dump and only minimal shares into another; Dr. Frost and OPKO continued to buy shares after the dumps; and Dr. Frost had no reason to participate in the alleged misconduct given his status as a successful businessman and the relative small size of the alleged penny stock scheme. *Id*.  Defendants would also contend that the SEC complaint that gave rise to this Action identified a different individual as the primary strategist who orchestrated the alleged stock manipulation schemes, and contained only sparse allegations about OPKO and Dr. Frost's involvement.  ¶¶ 44, 46.

9

In addition, Defendants had contended and would likely continue to argue that statements describing the investments as "strategic" were either puffery or opinions, and, in either event, were not actionable as a matter of law.  ¶ 41.  *See, e.g.*, *In re Airgate PCS, Inc. Sec. Litig.*, 389 F. Supp. 2d 1360, 1378-79 (N.D. Ga. 2005) (finding that statements that a transaction was a "strategic opportunity" with "growth potential" that provided "greater value for our shareholders" were "classic examples of mere puffery").  Defendants would also have continued to argue that the false statements in the stock-promotion articles at the heart of the pump-and-dump scheme were not actionable because the statements were made by third-parties, not Dr. Frost or OPKO.  ¶ 41.  In light of all of these arguments, Lead Plaintiff faced considerable risk that the Court or a jury would conclude that OPKO's statements concerning its "strategic investments" were not false or were not actionable.

**Statute of Repose.**  In addition, Defendants argued in their motion to dismiss, and would have continued to argue, that some of the alleged false statements were time-barred under the Exchange Act's five-year statute of repose.  *See* 28 U.S.C. § 1658(b).  Defendants argued that Lead Plaintiff's claims based on Defendants' statements denying the facts in the December 2013 report by Lakewood Capital (which reported that OPKO and Dr. Frost were involved in a "web of stock promotion") were time-barred because the alleged misstatements were made in late 2013 and the claims relating to those specific statements were first alleged in the Complaint filed in May 2019.  ¶ 42.  Had Defendants prevailed on this argument, several of Lead Plaintiff's alleged false statements, including Defendants' denial of the Lakewood Report, would have been dismissed. *Id*.

**Scienter.**  Even if Lead Plaintiff succeeded in proving that Defendants' statements were false, Lead Plaintiff would have faced additional challenges in proving that Defendants made the alleged false statements with the intent to mislead investors or were reckless in making the statements.  ¶¶ 43-47.  As noted, Defendants could point to the facts that neither OPKO nor Dr. Frost engaged in coordinated trading to "pump" the price of MabVax or BioZone; OPKO did not sell any of the MabVax or BioZone shares it held in the dumps (and thus, never profited from the alleged pump-and-dump schemes); and Dr. Frost sold none of his holdings in one of the companies and only small portions of his holdings in the other.  ¶¶ 44-45.  Defendants would argue that these facts made it implausible that they were knowingly involved in the pump-and-dump schemes or

10

intended to fraudulently inflate the price of OPKO stock and undercut any inference they acted with scienter.  *Id.*

Defendants would also point to the fact that Dr. Frost made substantial additional purchases of OPKO shares during the Class Period and would argue that his behavior was inconsistent with the allegation that Dr. Frost intended to mislead investors in order to artificially inflate the price of OPKO common stock.  ¶ 45.  Defendants also would have argued that any inference of scienter was undercut by the fact that the SEC complaint called Barry Honig, a nonparty to this Action, the "primary strategist" who "orchestrated" the pump-and-dump schemes, and alleged that Mr. Honig and Michael Brauser—and not Dr. Frost—were the principal actors in those schemes.  ¶ 46. Moreover, OPKO and Dr. Frost ultimately resolved the SEC Action by settling lesser claims that did not include a scienter element (as required for the fraud claims alleged in this Action).  ¶ 47. Thus, Lead Plaintiff faced the risk that it might not be able to prove that Defendants were aware of or participated in the stock manipulation scheme that underpinned this case.

(2)      <b>Risks to Proving Loss Causation and Damages</b>

As to any clams that remained, Defendants would argue that Lead Plaintiff could not establish loss causation for two reasons.

*First*, Defendants would have argued that Lead Plaintiff could not establish loss causation because the underlying facts about OPKO's and Dr. Frost's investments in BioZone and MabVax were already known to the market through the report by Lakewood Capital that was issued at the beginning of the Class Period and that Lead Plaintiff discussed in the Complaint.  The Lakewood Report asserted that OPKO's stock was "grossly overvalued," and OPKO and Dr. Frost were involved in a "web of stock promotion," in part due to OPKO's and Dr. Frost's relationships with some of the same serial stock promoters named as defendants in the SEC Action. ¶ 51.  According to Defendants, the Lakewood Report sufficiently put the market on notice of the matters at issue in this case.  *Id.*

*Second*, Defendants would have argued that the SEC complaint was unproven and the allegations were contested, and its mere allegations could not act as a true corrective disclosure of Defendants' alleged misstatements.  ¶ 52.  Defendants were able to cite to *Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013), in which the Eleventh Circuit held that the announcement of an SEC investigation failed to show loss causation as a matter of law.  While Lead Plaintiff believes *Meyer* is distinguishable—*i.e.*, the corrective disclosure here was the announcement of charges following

an SEC investigation rather than the mere announcement of an investigation—this line of argument posed a risk to Lead Plaintiff's claims.  ¶ 52.  Even if Lead Plaintiff prevailed on the motion to dismiss, where the Court must assume Lead Plaintiff's allegations were true, Defendants would have continued to argue at summary judgment and trial that Lead Plaintiff could not prevail on loss causation because the unproven allegations of the SEC complaint were never subsequently confirmed and, in fact, were not accurate.  ¶¶ 52-53.  Had either of Defendants' loss causation arguments been accepted at any time, recoverable damages would have been zero.

> **b)** **Risks Related to OPKO's Ability to Pay Support Approval of the Settlement**

Moreover, Lead Plaintiff also faced substantial risks of recovering on any judgment it obtained based on OPKO's ability to pay, a factor which was an important driver of Lead Plaintiff's determination that the amount of the Settlement and its timing were in the best interest of the Settlement Class.  ¶¶ 54-60.  There was a publicly disclosed coverage dispute between Defendants and their insurers that—if litigated and decided adversely to OPKO—could have left none of the insurance available to the class in this Action. ¶ 55.  Further, even if OPKO had prevailed in the coverage dispute, OPKO's insurance was limited and was a wasting asset that would have continued to have been reduced, and potentially exhausted, if litigation continued.  *Id*.

OPKO itself had only limited cash available to contribute to any settlement or other recovery.  ¶ 56.  In the months leading up to the Settlement, OPKO's financial condition was questionable and Lead Plaintiff had reasonable concerns that, if OPKO's financial condition continued to deteriorate during the course of protracted litigation, the Company might not be able to fund an amount equal to or larger than the Settlement Amount.  ¶¶ 56-58.  If the concerns about OPKO's ability to pay and the available insurance materialized, the class might have been unable to recover any amount even comparable to the Settlement through litigation (even assuming, as was by no means certain, that Lead Plaintiff prevailed on the merits of its claims at each procedural stage).

While Dr. Frost has his own substantial financial resources, the claims asserted against him would have been particularly difficult to prove because he continued to invest in OPKO common stock during the Class Period.  As discussed above, Defendants' Counsel would have argued that these continued purchases were inconsistent with the allegation that Dr. Frost intended to mislead investors in order to artificially inflate the price of OPKO common stock.  Thus, proceeding with the litigation in order to assert claims against Dr. Frost, without regard to OPKO's diminishing

ability to pay, would have been highly risky and could potentially have resulted in no meaningful recovery for the class.  ¶ 59.

       **c)**      **The Settlement is Reasonable in Light of the Likely Recoverable Damages**

Finally, the Settlement is reasonable when considered in relation to the range of potential recoveries that might be obtained if Lead Plaintiff prevailed, which was far from certain for the reasons noted above.  Assuming that Lead Plaintiff prevailed on liability issues at trial (which was far from certain), the realistic damages that could likely be proven at trial would be approximately $230 million.  ¶ 61.  However, that figure is not a particularly useful barometer.  If Defendants prevailed on their loss causation arguments, damages would be zero and the class would not recover anything.  In addition, the limits on OPKO's insurance and financial capabilities created a practical ceiling for any recovery from the Company that was considerably lower than the maximum damages that could potentially be proved at trial.

The Settlement Amount achieved represents approximately 7% of the realistic damages that could likely be established at trial.  This represents an excellent recovery for the Settlement Class, particularly in light of the other significant risks in the litigation, and the substantial additional costs and delays that would result from continued litigation.  Courts have routinely approved settlements with comparable or lower percentage recoveries than here.  *See, e.g., Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 10518902, at *10 (S.D. Fla. Oct. 17, 2016) (approving securities class action settlement representing "5.5% of maximum damages and 10% of the most likely damages" and referring to this as an "excellent" recovery); *In re Biolase, Inc. Sec. Litig.*, 2015 WL 12720318, at *4 (C.D. Cal. Oct. 13, 2015) (settlement recovery of 8% of estimated damages "equals or surpasses the recovery in many other securities class actions").  Moreover, as noted above, overriding concerns that OPKO might not able to pay the full amount of damages obtained at any trial rendered the analysis based on maximum damages much less relevant, as it appeared likely that the realistic ceiling for any recovery here was considerably lower.

       **d)**      **The Costs and Delays of Continued Litigation Support Approval of the Settlement**

The substantial costs and delays required before any recovery could be obtained through litigation also strongly support approval of the Settlement.  This case settled after extensive investigation but while Defendants' motion to dismiss the Complaint was still pending.  ¶¶ 19-21, 28.  Accordingly, achieving a litigated verdict in the Action would have required substantial

additional litigation.  In the absence of the Settlement, achieving a recovery for the Settlement Class would have required (assuming the Action survived the motion to dismiss): (i) a substantial amount of fact discovery (including document discovery and depositions); (ii) conducting complex and expensive expert discovery; (iii) briefing a motion for class certification and an expected motion for summary judgment; (iv) a trial involving substantial fact and expert testimony; (v) post-trial motions; and (vi) additional post-trial proceedings where Defendants could have challenged the damages of every class member, and whittled down the impact of any verdict.  ¶¶ 63, 99.

Finally, whatever the outcome at trial, it is virtually certain that appeals would be taken from any verdict.  ¶ 64.  At each step of the way, the risks in the case could have materialized.  For instance, even after the plaintiff prevailed at trial, defendants have successfully challenged the damages of class members in years of ensuing individual proceedings.  *See, e.g., In re Vivendi Universal SA Securities Litigation*, 765 F. Supp. 2d 520, 583-84 (S.D.N.Y. 2011).  Further, Courts of Appeals have vacated plaintiffs' trial verdicts in securities class actions after many years of litigation.  *See Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1145-49 (11th Cir. 1997) (reversing jury verdict on appeal after seven years of litigation).  Even assuming success at all these stages, such a protracted process would pose substantial expense to the class and delay any recovery for years.

*     *     *

In sum, Lead Plaintiff respectfully submits that, considering the risks of continued litigation, Defendants' ability to pay, and the time and expense which would be incurred to prosecute the action through a trial, the $16.5 million Settlement represents a favorable recovery that is in the best interests of the Settlement Class.  In contrast to costly, lengthy, and uncertain continued litigation, the Settlement provides an immediate, significant, and certain recovery for the Settlement Class.

### e)     All Other Factors Set Forth in Rule 23(c)(2)(C) Support Approval of the Settlement

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)."  Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv).  Each of these factors supports approval here.

First, the procedures for processing Settlement Class Members' claims and distributing the proceeds of the Settlement are equitable and effective.  Here, the proceeds of the Settlement will be distributed to Settlement Class Members by the Court-appointed Claims Administrator, JND Legal Administration ("JND"), an independent company with extensive experience handling the administration of securities class actions.  Consistent with well-established methods that have been widely used in securities class action litigation, Settlement Class Members who purchased shares in U.S. exchanges will be required to submit Claim Forms with documentation to JND.[3]  JND will review and process the claims, provide claimants with an opportunity to cure any deficiencies in their claims or request review by the Court, and will then mail or wire eligible Claimants their *pro rata* share of the US Net Settlement Fund (as calculated under the Plan of Allocation) upon approval of the Court.  ¶¶ 75-78.  This type of claims processing is standard in securities class actions and has long been found to be effective.  Such claim filing and processing is necessary because neither Lead Plaintiff nor OPKO possess the trading data for individual Settlement Class members that would otherwise allow for a "claims-free" process to distribute US Net Settlement Fund.  ¶ 74.  As discussed further below, members of the Settlement Class that purchased their OPKO shares on the Tel Aviv Stock Exchange ("TASE") will be able to receive their portion of the TASE Net Settlement Fund without needing to submit a Claim Form.  ¶¶ 79-81.

Second, the relief provided for the Settlement Class in the Settlement is also adequate when the terms of the proposed award of attorneys' fees are taken into account.  As discussed in the accompanying Fee Memorandum, the requested attorneys' fees of 20% of the Settlement Fund, to be paid upon approval by the Court, are reasonable in light of the efforts of Lead Counsel and the risks in the litigation.  Indeed, the percentage fee request is below the Eleventh Circuit benchmark and the fee request represents a modest multiplier of Plaintiffs' Counsel's lodestar.  Most importantly, approval of attorneys' fees is entirely separate from approval of the Settlement, and no party has the right to terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees.  *See* Stipulation ¶ 17.

Lastly, Rule 23 asks the court to consider the fairness of the proposed settlement in light of any agreements required to be identified under Rule 23(e)(3).  *See* Fed. R. Civ. P.

---

[3] The Settlement is not a claims-made settlement.  If the Settlement is approved, Defendants will have no right to the return of any portion of Settlement based on the number or value of Claims submitted.  *See* Stipulation ¶ 14.

23(e)(2)(C)(iv).  Here, the only such agreement (other than the Stipulation itself) is the Parties' confidential Supplemental Agreement, which sets forth the conditions under which Defendants may terminate the Settlement if the requests for exclusion from the Settlement Class reach a certain threshold.  *See* Stipulation ¶ 37.  "This type of agreement is a standard provision in securities class actions and has no negative impact on the fairness of the Settlement."  *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *13 (S.D.N.Y. July 21, 2020).

### 4.    The Settlement Treats Settlement Class Members Equitably

The proposed Settlement treats members of the Settlement Class equitably relative to one another.  As discussed below in Part II.B, pursuant to the Plan of Allocation, eligible claimants will receive their *pro rata* share of the recovery based on their purchases or acquisitions of OPKO common stock during the Class Period.  Lead Plaintiff will receive the same level of *pro rata* recovery under the Plan of Allocation as all other Settlement Class Members.

### 5.    Other Factors Considered by the Eleventh Circuit Support Approval of the Settlement

Other factors considered by the Eleventh Circuit, including the reaction of the Settlement Class to the Settlement and the stage of proceedings at which the Settlement was achieved, *see Bennett*, 737 F.2d at 986, also support approval of the Settlement.

Under the Preliminary Approval Order, the deadline for Settlement Class Members to exclude themselves from the Settlement Class or object to the Settlement is November 24, 2020.  To date, three requests for exclusion and no objections to the proposed Settlement have been received.  ¶ 71; Segura Decl. (Ex. 3) at ¶ 13.  Lead Plaintiff will file a reply brief by December 8, 2020 addressing all requests for exclusion and any objections that may be received.

The stage of proceedings at which the Settlement was achieved also supports its approval.  This factor is evaluated to determine whether plaintiff and its counsel "had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation." *Berman*, 2019 WL 6163798, at *8; *accord Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005).  Here, despite the early stage of the litigation, Lead Plaintiff had conducted an extensive investigation into the claims and engaged in an extensive mediation process, through which it obtained sufficient information about the strengths and weaknesses of the claims and other risks in the litigation to adequately evaluate the merits of the case. *See Preman v. Pollo Operations, Inc.*, 2018 WL 3151673, at *10 (M.D. Fla. Apr. 12, 2018) ("While the parties reached settlement at an early stage of the proceedings, their settlement was

the result of 'intensive arms-length negotiations between experienced attorneys who are familiar with class action litigation . . .'" and the "parties had 'obtained sufficient information' needed to evaluate the strengths and weaknesses of Plaintiff's arguments.").

In sum, all of factors to be considered under Rule 23(e)(2) support a finding that the Settlement is fair, reasonable, and adequate.

### B.     The Plan of Allocation is Fair and Reasonable

Like a settlement, a plan of allocation for distribution of the settlement must be "fair, adequate and reasonable." *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982).  A plan of allocation need not be precise, but will be found fair and reasonable where there is a "rough correlation" between class members' injuries and the settlement distribution.  *Id.* at 240; *see Vinh Nguyen v. Radient Pharms. Corp.*, 2014 WL 1802293, at *5 (C.D. Cal. May 6, 2014) ("[a]n allocation formula need only have a reasonable, rational basis").  Courts give great weight to the opinion of experienced counsel in evaluating plans of allocation.  *See Yang*, 2014 WL 4401280, at *9.

The proposed Plan of Allocation, which was developed by Lead Plaintiff's damages expert in consultation with Lead Counsel and is set forth in the Notice, provides a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members.  ¶¶ 72, 82.  The Plan divides the Net Settlement Fund into a fund for payment of claims of Settlement Class Members who purchased OPKO common stock on U.S. exchanges, including the New York Stock Exchange and Nasdaq (the "US Net Settlement Fund"), and one for the payment of claims of Settlement Class Members who purchased OPKO common stock on the TASE (the "TASE Net Settlement Fund").  ¶ 73.  The allocation of the Net Settlement Fund between these two funds was determined by the relative trading volume of shares on the U.S. exchanges and the TASE during the Class Period, as determined by Lead Plaintiff's expert.  ¶ 74.

In order to share in the US Net Settlement Fund, Settlement Class Members will need to submit a Claim Form documenting their transactions in OPKO common stock during the Class Period.  ¶ 75.  As set forth in the Plan, a US Recognized Loss Amount will be calculated for each purchase of OPKO common stock traded on a U.S. exchange (or in any other manner other than through a purchase on the TASE) during the Class Period that is listed on the Claimant's Claim Form and for which adequate documentation is provided.  ¶ 76.  In general, US Recognized Loss Amounts will be calculated as the lesser of:  (a) the difference between the amount of alleged

17

artificial inflation in OPKO common stock at the time of purchase or acquisition and the time of sale, or (b) the difference between the purchase price and the sale price (if sold during the Class Period). *Id*. The sum of a Claimant's US Recognized Loss Amounts for all of his, her, or its purchases of OPKO common stock traded on U.S. exchanges during the Class Period will be Claimant's "US Recognized Claim." ¶ 78. The US Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their US Recognized Claims. *Id*.

Settlement Class Members who purchased shares traded on the TASE will not have to submit a Claim Form to be eligible for a recovery on those shares. Instead, the Claims Administrator will take advantage of a "claim-free" mechanism that is available for Israeli shareholder class actions. ¶ 79. Under this procedure, TASE member brokers will report the total number of eligible shares purchased by their clients (*i.e.*, shares purchased during the Class Period and held through the close of trading on the TASE on September 6, 2018), and the Claims Administrator will send each broker its *pro rata* share of the TASE Net Settlement Fund, which the brokers will then distribute to their clients based on their trading. ¶¶ 80-81.

With respect to both the US Net Settlement Fund and TASE Net Settlement Fund, persons who bought OPKO common stock during the Class Period but sold it before the SEC complaint was released on September 7, 2018 will not be entitled to any recovery for such purchases. ¶¶ 76, 80.

### C.     The Settlement Class Should be Certified

In connection with the Settlement, the Parties have stipulated to the certification of the Settlement Class for the purposes of the Settlement. *See* Stipulation ¶ 2. As detailed in Lead Plaintiff's brief in support of preliminary approval of the Settlement, the Settlement Class satisfies all the requirements of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure. *See* ECF No. 112 at 12-17; *see also* Preliminary Approval Order (ECF No. 115) at ¶¶ 1-3 (finding that the Court will likely be able to certify the Settlement Class). None of the facts regarding certification of the Settlement Class have changed since Lead Plaintiff submitted its motion for preliminary approval, and there has been no objection to certification. Accordingly, Lead Plaintiff respectfully requests that the Court certify the Settlement Class under Rules 23(a) and (b)(3).

### D.   Notice to the Settlement Class Satisfied Rule 23 and Due Process

The Notice to the Settlement Class satisfied the requirements of Rule 23, which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The Notice also satisfies Rule 23(e)(1), which requires a court to "direct notice in a reasonable manner to all class members who would be bound" by the proposed settlement. *Kuhr v. Mayo Clinic Jacksonville*, 2020 WL 5912350, at *9 (M.D. Fla. Oct. 6, 2020); *see generally Wal-Mart Stores, Inc. v. Visa U.S.A.*, 396 F.3d 96, 114 (2d Cir. 2005) (the settlement notice should "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings").

Both the substance of the Notice and the method of its dissemination to potential members of the Settlement Class satisfied these standards. In addition, the Court-approved Notice includes all the information required by Federal Rule of Civil Procedure 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 78u-4(a)(7). In accordance with the Court's Preliminary Approval Order, JND began mailing copies of the Notice and Claim Form to potential Settlement Class Members on September 22, 2020. *See* Segura Decl. (Ex. 3) at ¶¶ 2-6. As of November 9, 2020, JND had disseminated 249,070 copies of the Notice Packet to potential Settlement Class Members and nominees. *See id*. ¶ 9. In addition, Lead Counsel caused the Summary Notice to be published in the *Wall Street Journal* and the Israeli newspaper *Globes* and over the *PR Newswire* on October 8, 2020. *See id.* ¶ 10. This combination of individual mail to all Settlement Class Members who could be identified with reasonable effort, supplemented by publication in relevant, widely circulated newspapers and over a newswire, was the best notice practicable under the circumstances. *See Aranaz v. Catalyst Pharm. Partners Inc.*, 2014 WL 11870214, at *2-3 (S.D. Fla. Dec. 3, 2014) (notice distributed by first class mail to all class members "who can be identified with reasonable effort . . . constitute[s] the best notice practicable under the circumstances; and constitute[s] due and sufficient notice to all persons and entities entitled thereto").

## III.   CONCLUSION

Lead Plaintiff respectfully requests that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate.

Dated: November 10, 2020

Respectfully submitted,

**SAXENA WHITE P.A.**

*/s/ Brandon T. Grzandziel*
Joseph E. White, III
Brandon T. Grzandziel
7777 Glades Road
Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (888) 478-6711
Email: jwhite@saxenawhite.com
Email: brandon@saxenawhite.com

*Liaison Counsel for Lead Plaintiff The Amitim Funds*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ John Rizio-Hamilton*
Avi Josefson (*pro hac vice*)
John Rizio-Hamilton (*pro hac vice*)
Adam D. Hollander (*pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Email: avi@blbglaw.com
Email: johnr@blbglaw.com
Email: adam.hollander@blbglaw.com

*Lead Counsel for Lead Plaintiff The Amitim Funds*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 10, 2020, a copy of the foregoing was filed with the

Clerk of the Court using the CM/ECF electronic notification system, which will send a notice of

electronic filing to all parties of record.

*/s/ Brandon T. Grzandziel*
Brandon T. Grzandziel